AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

### for the
### Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| A white 2011 International truck tractor and SUBJECT DEVICES as further described in Attachments A1 and A2. | ) ) ) | MJ 19-5020-RBL |

FILED  LODGED
RECEIVED

FEB 13 2019

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                    DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachments A1 and A2, attached hereto and incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments B1 and B2, attached hereto and incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a) and 846 | Distribution of, and Conspiracy to Distribute, Controlled Substances. |

The application is based on these facts:

✓ See Affidavit of SA Michelle Hardin-Pineda, Homeland Security Investigations.  Attached hereto and incorporated herein.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☐ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Special Agent Michelle Hardin-Pineda, HSI
*Printed name and title*

◉ The foregoing affidavit was sworn to before me and signed in my presence, or
○ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 2-13-19

_____
*Judge's signature*

City and state: Tacoma, Washington

Ronald B. Leighton, United States District Judge
*Printed name and title*

USAO# 2018R01379

# AFFIDAVIT

1
2  STATE OF WASHINGTON           )
3                               )    ss
4  COUNTY OF PIERCE             )
5       I, MICHELLE HARDIN-PINEDA, being first duly sworn, depose and state as
6  follows:

## INTRODUCTION AND AGENT BACKGROUND

7
8       1.      I am a Special Agent with U.S. Immigration and Customs Enforcement
9  ("ICE"), Homeland Security Investigations ("HSI"), in Seattle, Washington, and have
10 been so employed since February 2006.  I am currently assigned to the HSI Field Office
11 in Seattle, Washington.  In my current capacity, I investigate federal criminal violations
12 including money laundering, smuggling, drug trafficking, commercial fraud, and
13 intellectual property theft.
14      2.      I have successfully completed the Federal Law Enforcement Training
15 Center ("FLETC") Criminal Investigator Training Program in Brunswick, Georgia.
16 While at FLETC, I completed the Criminal Investigator Training Program and
17 Immigration and Customs Enforcement Special Agent Training.  As part of my duties as
18 a Special Agent, I have led and participated in numerous investigations involving
19 smuggling, drug trafficking, commercial fraud, intellectual property theft and money
20 laundering.  Additionally, I have been involved in all aspects of criminal investigations
21 including surveillance and undercover operations, and I am authorized to serve and
22 execute search and arrest warrants.

## PURPOSE OF AFFIDAVIT

23
24      3.      This affidavit is submitted in support of an application for search warrants
25 pursuant to Federal Rule of Criminal Procedure 41 to search the vehicle and cellular
26 telephones (hereinafter collectively the "SUBJECT DEVICES"), described below, more
27 particularly described in Attachments A1 and A2, attached hereto and incorporated
28 herein:

AFFIDAVIT OF SA HARDIN-PINEDA – 1
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1         a.     A white 2011 International Prostar tractor truck, with California

2 license plate WP83996 and vehicle identification number (VIN)

3 3HSCTAPR9BN323785 (hereinafter "SUBJECT VEHICLE");

4         b.     A black Alcatel Cricket phone (hereinafter "SUBJECT DEVICE

5 #1"), seized from BRIHAN BENITEZ-GONZALEZ at the time of his arrest on

6 November 11, 2018;

7         c.     A gold, black, and white Samsung phone in a black Xbox case

8 (hereinafter "SUBJECT DEVICE #2"), seized from BRIHAN BENITEZ-GONZALEZ

9 at the time of his arrest on November 11, 2018;  and

10         d.     A black Apple iPhone in a black and blue case (hereinafter

11 "SUBJECT DEVICE #3"), seized at the time of the arrest of OSCAR MILLAN on

12 November 11, 2018.

13     4.     The applied-for warrant would authorize the search of SUBJECT

14 VEHICLE for the items particularly described in Attachment B1, and SUBJECT

15 DEVICES for the purpose of identifying electronically stored data particularly described

16 in Attachment B2.

17     5.     The items to be searched are currently in the lawful possession of

18 Washington State Patrol or Auburn Police Department.  SUBJECT VEHICLE was seized

19 on November 11, 2018, at the time of the arrest of OSCAR MILLAN ("MILLAN") and is

20 currently held at a Washington State Patrol storage facility located at 8623 Armstrong Rd.

21 SW, Olympia, Washington.  SUBJECT DEVICES were seized on November 11, 2018, at

22 the time of the arrest of BRIHAN BENITEZ-GONZALEZ ("BENITEZ-GONZALEZ")

23 and MILLAN.  SUBJECT DEVICES are currently held in evidence by Auburn Police

24 Department, located at 340 E. Main Street Auburn, Washington.

25     6.     In my training and experience, I know that SUBJECT DEVICES have been

26 stored in a manner in which their contents are, to the extent material to this investigation,

27 in substantially the same state as they were when the devices first came into the

28 possession of law enforcement.

AFFIDAVIT OF SA HARDIN-PINEDA – 2
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

7.    The facts set forth in this Affidavit are based on my own personal knowledge; information obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for the requested search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation.

8.    As set forth herein, there is probable cause to believe that a search of SUBJECT VEHICLE and SUBJECT DEVICES will reveal evidence of violations of Title 21, United States Code, Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance).  The items to be seized are described within Attachments B1 and B2, incorporated herein, and comprise evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance).

## SUMMARY OF PROBABLE CAUSE

9.    On or about August 30, 2018, CS-1 advised Homeland Security Investigations (HSI) Special Agent Nathan Clammer that he/she was in contact with a methamphetamine and heroin trafficker believed to be in Mexico who introduced himself to CS-1 as "Jaipo."  On August 31, 2018, CS-1 advised that Jaipo had provided CS-1 a phone number for a man in the United States who worked for Jaipo trafficking drugs. CS-1 called the number provided by Jaipo and spoke to an uncharged co-conspirator herein referred to as "J.I."  After multiple phone conversations, CS-1 agreed to purchase fourteen pounds of methamphetamine from J.I.

10.    On September 27, 2018, HSI and DEA agents arrested J.I. as he attempted to deliver fourteen pounds of methamphetamine to CS-2 – a source cooperating with law

AFFIDAVIT OF SA HARDIN-PINEDA – 3
USAO #2018R01379

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1    enforcement who had also been in phone contact with with Jaipo and J.I.  Upon arrest, it

2    was determined that J.I. was illegally present in the United States.  J.I. has since been

3    deported to Mexico.

4         11.    After J.I.'s arrest, Jaipo provided CS-2 contact information for another drug

5    trafficker – "Chema" – who worked with Jaipo.  Over the course of several phone calls,

6    Chema advised CS-2 that he could sell CS-2 at least one-hundred pounds of

7    methamphetamine.  Chema initially stated that the methamphetamine was in San

8    Bernardino, California, but later agreed to transport and deliver the methamphetamine to

9    CS-2 in Washington State.  Chema also agreed to supply CS-2 with multiple kilograms of

10   heroin.  After agreeing to sell CS-2 both methamphetamine and heroin, Chema provided

11   CS-2 with contact information for – "Primo" – another member of the drug trafficking

12   organization.

13        12.    In early November 2018, CS-2 began discussing with Primo the final

14   details of the methamphetamine and heroin deal.  Primo indicated that the individual that

15   would be delivering the drugs in Washington State was named "Brihan."

16        13.    On or about November 8, 2018, CS-2 received a phone call from a person

17   who identified himself as "Brihan" – subsequently identified as BENITEZ-GONZALEZ.

18   BENITEZ-GONZALEZ advised CS-2 that he would be travelling to Washington State to

19   conclude the deal with CS-2.

20        14.    Shortly after 7:00 p.m., on November 10, 2018, BENITEZ-GONZALEZ

21   arrived at Seattle-Tacoma International airport ("Sea-Tac").  CS-2 picked up BENITEZ-

22   GONZALEZ at SeaTac and took him to a Ramada Hotel near the airport.  BENITEZ-

23   GONZALEZ told CS-2 that the drugs were in Washington State and that he would be

24   ready to conduct the transaction the following day.

25        15.    On November 11, 2018, investigators met with CS-1 and CS-2 in Federal

26   Way, Washington.  CS-1 advised SA Clammer that he had spoken to BENITEZ-

27   GONZALEZ on the morning of November 11, 2018, and BENITEZ-GONZALEZ told

28   CS-1 that the drugs were hidden in a vehicle loaded on a car carrier that was being pulled

AFFIDAVIT OF SA HARDIN-PINEDA – 4
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   by a white tractor truck.  CS-1 advised that BENITEZ-GONZALEZ was with the tractor-
2   trailer and that it was parked at a Walmart in Chehalis, Washington.

3       16.    SA Clammer then made contact with Detective Adam Haggerty, a Task
4   Force Officer with DEA, and requested that surveillance be established on the tractor-
5   trailer described by CS-1.  Early in the afternoon of November 11, 2018, law
6   enforcement officers with the Joint Narcotics Enforcement Team established surveillance
7   on a white 2011 International Prostar tractor truck, *i.e.*, SUBJECT VEHICLE, at Walmart
8   in Chehalis, Washington.  Attached to SUBJECT VEHICLE was a car carrier with one
9   vehicle loaded on the car carrier.  During surveillance, JNET officers observed three
10  males in and around SUBJECT VEHICLE.

11      17.    SA Clammer then directed CS-1 and CS-2 to meet with BENITEZ-
12  GONZALEZ and the other two suspects – subsequently identified as MILLAN and D.S.
13  Prior to being released to meet with the targets of the investigation, CS-1, CS-2, and their
14  vehicle were searched for contraband.  No contraband was found on either CS-1 or CS-2,
15  or in their vehicle.

16      18.    At approximately 4:30 p.m., CS-1 and CS-2 met with BENITEZ-
17  GONZALEZ, MILLAN, and D.S. in the Walmart parking lot in Chehalis, Washington.
18  Upon arrival, CS-1 asked BENITEZ-GONZALEZ to take the car off the car carrier so
19  that CS-1 could look at the drugs.  MILLAN told CS-1 that they had been sitting at
20  Walmart too long and that he was not comfortable doing it there.  The parties agreed that
21  the car could be taken off the car carrier at another location.  CS-1 then provided the
22  address of the secondary location to MILLAN.

23      19.    MILLAN and D.S. then reentered SUBJECT VEHICLE and departed the
24  Walmart parking lot – they were followed by CS-1, CS-2, and BENITEZ-GONZALEZ in
25  CS-1's vehicle.  Law enforcement maintained visual surveillance on both vehicles as they
26  departed the area of the Walmart parking lot.

27      20.    As they were driving, CS-1 asked BENITEZ-GONZALEZ where the drugs
28  were concealed.  BENITEZ-GONZALEZ said that some of the drugs were in the trunk

AFFIDAVIT OF SA HARDIN-PINEDA – 5
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and the rest were hidden in the doors.  CS-1 asked if he/she would need tools, as CS-1

2   explained that he/she did not have any tools with him/her.  BENITEZ-GONZALEZ said

3   that at most CS-1 would need a couple of screwdrivers.

4        21.    When the vehicles arrived at the 1200 block of Alder Street in Centralia,

5   Washington, SUBJECT VEHICLE pulled to the shoulder of the road.  The vehicle with

6   CS-1, CS-2, and BENITEZ-GONZALEZ parked on an adjacent street approximately

7   seventy-five feet from SUBJECT VEHICLE.  Law enforcement then observed MILLAN

8   and D.S. get out of SUBJECT VEHICLE.  Once out of SUBJECT VEHICLE, agents

9   observed MILLAN and D.S. unfasten the tie downs from the vehicle on the car carrier – a

10  silver blue Toyota Prius.  Law enforcement then observed D.S. drive the Prius off the car

11  carrier attached to SUBJECT VEHICLE.

12       22.    Once the car was unloaded, CS-1 opened the trunk and lifted the partition

13  that covered the spare tire compartment.  CS-1 then observed a large number of

14  individually wrapped packages of suspected methamphetamine.

15       23.    CS-1 asked MILLAN where the rest of the drugs were.  MILLAN

16  responded that the rest was in the doors.  CS-1 then asked MILLAN if CS-1 would need

17  any tools to access the additional drugs in the doors.  MILLAN told CS-1 that he/she

18  might need a couple of screwdrivers.

19       24.    CS-1 then got into the car containing the drugs and prepared to drive away.

20  Before CS-1 departed the area, MILLAN returned to the load vehicle and dropped two

21  screwdrivers onto the right side front passenger seat of the car.  As CS-1 drove away,

22  agents moved in and arrested BENITEZ-GONZALEZ and MILLAN.

23       25.    At the time of the arrest of BENITEZ-GONZALEZ, SUBJECT DEVICE

24  #1 and SUBJECT DEVICE #2 were seized from his person.  After being advised of his

25  *Miranda* rights, BENITEZ-GONZALEZ made a statement disavowing any knowledge of

26  the transaction or what was hidden in the Prius that had been offloaded from the car

27  carrier attached to SUBJECT VEHICLE by MILLAN and D.S.

28

AFFIDAVIT OF SA HARDIN-PINEDA – 6
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

26.     At the time of the arrest of MILLAN, SUBJECT DEVICE #3 was seized from the dashboard of SUBJECT VEHICLE.  After being advised of his *Miranda* rights, MILLAN declined to make a post-arrest statement.

27.     At approximately 5:54 p.m., on November 11, 2018, Detective Haggerty obtained a State of Washington Search Warrant for the silver blue Prius that had been offloaded from the car carrier by D.S.  When law enforcement executed this warrant, they located one-hundred twenty-one pound-size packages of methamphetamine and five kilogram-size packages of heroin.  The heroin and methamphetamine were subsequently field-tested, with each suspected drug testing presumptively positive for heroin or methamphetamine.

28.     The drugs were all found in the trunk and in the doors of the Prius – just as BENITEZ-GONZALEZ and MILLAN had told CS-1 that they would be.  Furthermore, the only tools that were needed to access the drugs hidden in the door panels were the screwdrivers that had been provided by MILLAN to CS-1 as he/she drove away in the vehicle containing the drugs.

**Cooperating Source Reliability and Background**

29.     The reliability of CS-1 is based on the fact that he/she has assisted HSI with several investigations in the past.  I am not aware of any false information provided by CS-1 during previous investigations.  CS-1 shows a working knowledge of the drug trade, and has been arrested and convicted for one felony drug crime.  In return for cooperating with law enforcement, CS-1 receives monetary compensation and immigration benefits that allow him/her to remain in the U.S. lawfully.

30.     The reliability of CS-2 is based on the fact that he/she has assisted HSI with several investigations in the past.  I am not aware of any false information provided by CS-2 during previous investigations.  However, I am aware that on at least one occasion, CS-2 did not follow procedures regarding the proper handling of a controlled substance received from a target of investigation.  CS-2 shows a working knowledge of the drug trade and has been convicted of multiple felony drug crimes.  CS-2 also has a conviction

AFFIDAVIT OF SA HARDIN-PINEDA – 7
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  for Re-entry After Deportation and a supervised release violation related to that charge.

2  Finally, CS-2 has been arrested for DUI, Possession of a Firearm, and Driving Without a

3  License. CS-2 receives monetary compensation and immigration benefits that allow

4  him/her to remain in the U.S. lawfully.

5  **DIGITAL DEVICES AS INSTRUMENTALITIES OF THE CRIMES**

6  31.  Based upon my training and experience, and conversations with, and

7  training from, other officers and agents involved in narcotics investigations, I know the

8  following about drug traffickers and their use of cell phones.

9  32.  Traffickers of controlled substances commonly maintain records reflecting

10  names or nicknames, addresses, vehicles, and/or telephone numbers of their suppliers,

11  customers and associates in the trafficking organization.  Traffickers commonly maintain

12  this information in books or papers as well as in cellular telephones and other electronic

13  devices.  Traffickers often maintain cellular telephones for ready access to their clientele

14  and to maintain their ongoing narcotics business.  Traffickers frequently change their

15  cellular telephone numbers to avoid detection by law enforcement, and it is common for

16  traffickers to use more than one cellular telephone at any one time.

17  33.  Narcotics traffickers sometimes take, or cause to be taken, photographs

18  and/or video recordings of themselves, their associates, their property, and their illegal

19  product.  Given the widespread use of digital cameras, and the fact that virtually all smart

20  phones have a built-in digital camera, I know that digital photos and/or video recordings

21  are likely to be found on SUBJECT DEVICES.

22  34.  Drug dealers use cellular telephones as a tool or instrumentality in

23  committing their criminal activity.  They use them to maintain contact with their

24  suppliers, distributors, and customers.  They prefer cellular telephones because, first, they

25  can be purchased without the location and personal information that land lines require.

26  Second, they can be easily carried to permit the user maximum flexibility in meeting

27  associates, avoiding police surveillance, and traveling to obtain or distribute drugs.

28  Third, they can be passed between members of a drug conspiracy to allow substitution

AFFIDAVIT OF SA HARDIN-PINEDA – 8
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   when one member leaves the area temporarily.  Since cellular phone use became

2   widespread, every drug dealer I have contacted has used one or more cellular telephones

3   for his or her drug business.  I also know that it is common for drug traffickers to retain in

4   their possession phones that they previously used, but have discontinued actively using,

5   for their drug trafficking business.  Based on my training and experience, the data

6   maintained in a cellular telephone used by a drug dealer is evidence of a crime or crimes.

7   This includes the following:

8         35.     The assigned number to the cellular telephone (known as the mobile

9   directory number or MDN), and the identifying telephone serial number (Electronic

10  Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile

11  Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are

12  important evidence because they reveal the service provider, allow us to obtain subscriber

13  information, and uniquely identify the telephone.  This information can be used to obtain

14  toll records, to identify contacts by this telephone with other cellular telephones used by

15  co-conspirators, to identify other telephones used by the same subscriber or purchased as

16  part of a package, and to confirm if the telephone was contacted by a cooperating source.

17        36.     The stored list of recent received, missed, and sent calls is important

18  evidence.  It identifies telephones recently in contact with the telephone user.  This is

19  valuable information in a drug investigation because it will identify telephones used by

20  other members of the organization, such as suppliers, distributors and customers, and it

21  confirms the date and time of contacts.  If the user is under surveillance, it identifies what

22  number he called during or around the time of a drug transaction or surveilled meeting.

23  Even if a contact involves a telephone user not part of the conspiracy, the information is

24  helpful (and thus is evidence) because it leads to friends and associates of the user who

25  can identify the user, help locate the user, and provide information about the user.

26  Identifying a defendant's law-abiding friends is often just as useful as identifying his

27  drug-trafficking associates.

28

AFFIDAVIT OF SA HARDIN-PINEDA – 9
USAO #2018R01379

37.     Stored text messages are important evidence, similar to stored numbers. Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

38.     Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user.  Pictures also identify associates likely to be members of the drug trafficking organization.  Also, digital photos often have embedded "geocode" or GPS information embedded in them.  Geocode information is typically the longitude and latitude where the photo was taken.  Showing where the photo was taken can have evidentiary value.  This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

39.     Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

## ADDITIONAL TRAINING AND EXPERIENCE OF THE AFFIANT

40.     I know from training and experience that drug dealers often keep records of drug sales and transactions at their residences, within their vehicles and within their "stash locations" (*i.e.*, a storage unit or residence owned or rented in the name of a third party).  These records are kept so that the drug dealers can keep track of the money owed to them for the amount of drugs being sold.  I know persons involved in the trafficking of illicit drugs often keep large amounts of cash either on hand, on their person, within their residence or within their vehicle or stash location. The selling of illicit drugs is a cash business, and I know, from training and experience, that persons involved in this business need cash to re-supply themselves with product, and that they oftentimes avoid the traditional money holding facilities in an attempt to avoid detection by law enforcement. I also know that drug dealers often convert cash proceeds into valuable items such as precious metals and gems such as gold, silver, diamonds, Rolex watches, necklaces, *etc.*

AFFIDAVIT OF SA HARDIN-PINEDA – 10
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

41.    I know from my training and experience that drug dealers need to continually resupply themselves so as to always have an amount of product on hand to supply the demand of their customers and to support themselves and their illegal business.  I know that drug dealing is a business in which a dealer typically buys a larger amount of drugs and then breaks those larger amounts down into smaller amounts that they can sell to different customers.  Drug dealing is also based on selling a particular quantity of drugs for a specific amount of money, which is usually paid in cash. Accordingly, I know that drug dealers will regularly keep scales and packaging material (plastic sandwich bags, plastic wrap, Tupperware containers, glass vials, heat or vacuum sealers, *etc*.) on hand so they can weigh out and repackage their drugs for sale.  I also know that even when a dealer is temporarily out of drugs they will often still possess scales and packaging materials so they can use them when they are resupplied, and that dealers typically keep these items for long periods of time.

42.    I know that from my training and experience that drug traffickers utilize interstate and international travel to further the goals of their operation such as to resupply themselves with narcotics to sell, to engage in financial transactions, and to launder proceeds.  Drug traffickers often maintain records of their travel in the form of airline tickets, notes and travel itineraries; airline schedules; bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel-related businesses; airline, rent-a-car, and hotel frequent flier or user cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel.

43.    I know from my training and experience that drug dealers often use vehicles in furtherance of their illegal activities, both to help them facilitate their drug sales but also as a place to store their drugs.  Furthermore, I know that drug dealers switch the vehicles they use frequently in order to thwart the efforts of law enforcement in detecting them.

AFFIDAVIT OF SA HARDIN-PINEDA – 11
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

44.     I also know that people involved in the possession and distribution of controlled substances often maintain in their residences, and sometimes at stash locations, vehicles and storage units, indicia of occupancy and ownership, including, but not limited to records that establish the person(s) who have control, possession, custody or dominion over the property from which evidence is seized, such as: personal mail, checkbooks, personal identification, notes, other correspondence, utility bills, rent receipts, payment receipts, financial documents, keys, photographs (developed, undeveloped, or digital), leases and mortgage bills.  Such records are evidence that a particular person is residing at a residence and associated with what is found inside the residence.

45.     Drug traffickers amass large proceeds from the illegal sale of controlled substances that they attempt to hide and/or legitimize.  To hide and legitimize these proceeds, drug traffickers utilize financial institutions and their attendant services, money orders, wire transfers, securities, cashier's checks, safe deposit boxes and keys, checks, money drafts, real estate, shell operations, and business fronts.  Persons involved in drug trafficking and/or money laundering keep papers relating to these activities for future reference, including Federal and State tax records, loan records, mortgages, deeds, titles, certificates of ownership, records regarding investments and securities, safe deposit box rental records and keys, wire transfer and money order records, and photographs.

46.     Furthermore, I know individuals involved in the trafficking and distribution of controlled substances will often hide their drug evidence in sheds, outbuildings, vehicles, safes, hidden compartments, and inner walls of residences, and other containers within the curtilage to avoid detection by law enforcement officials and to protect those items from others, as drug dealing is an illicit cash business which makes the dealer a target of robberies.

47.     I also know that persons who illegally possess and distribute controlled substances often possess firearms and ammunition to protect themselves, their drugs and their drug proceeds from others.  As noted above, drug dealing is a cash business which makes the dealer a target of robberies, and dealers often maintain firearms and

AFFIDAVIT OF SA HARDIN-PINEDA – 12
USAO #2018R01379

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1   ammunition to protect their drugs and cash.  I also know that drug dealers will often need
2   or use firearms to help them intimidate potential rivals and to aid in the collection of drug
3   debts.  Therefore, I know that firearms and ammunition, knives and other weapons are
4   often found at the location of narcotic search warrants and on persons involved in drug
5   dealing and trafficking.

6       48.    I know that firearms are a valuable commodity and are kept for long
7   periods of time.  I know from training and experience that it is common practice among
8   persons who illegally possess firearms for them to secrete the firearms and firearms
9   accessories upon their person, upon the persons of co-conspirators, within their vehicles,
10  vehicles of co-conspirators, within their residence, and within the boundaries of the
11  curtilage of their residences.

12      49.    Evidence of illegal trafficking of controlled substances and money
13  laundering, such as the items described above, is likely to be found where the dealers live
14  even if the distribution or transaction did not occur at the residence.  Moreover,
15  individuals involved in large, long-term drug trafficking organizations typically maintain
16  such evidence for an extended period of time.

17  **TECHNICAL TERMS**

18      50.    Based on my training and experience, I use the following technical terms to
19  convey the following meanings:

20      a.    Wireless telephone:  A wireless telephone (or mobile telephone, or
21  cellular telephone) is a handheld wireless device used for voice and data communication
    through radio signals.  These telephones send signals through networks of
22  transmitter/receivers, enabling communication with other wireless telephones or
    traditional "land line" telephones.  A wireless telephone usually contains a "call log,"
23  which records the telephone number, date, and time of calls made to and from the phone.
24  In addition to enabling voice communications, wireless telephones offer a broad range of
    capabilities.  These capabilities include: storing names and phone numbers in electronic
25  "address books;" sending, receiving, and storing text messages and e-mail; taking,
26  sending, receiving, and storing still photographs and moving video; storing and playing
    back audio files; storing dates, appointments, and other information on personal
27  calendars; and accessing and downloading information from the Internet.  Wireless
28

AFFIDAVIT OF SA HARDIN-PINEDA – 13
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

51.     Based on my training, experience, and research and from consulting the manufacturers' advertisements and product technical specifications available online, I know that SUBJECT DEVICES have the capability that allow them to serve as a wireless telephone, digital camera, and/or GPS navigation device. In my training and experience, examining data stored on devices such as SUBJECT DEVICES can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

52.     Based on my knowledge, training, and experience, I know that digital devices and electronic storage media can store information for long periods of time.

AFFIDAVIT OF SA HARDIN-PINEDA – 14
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Similarly, things that have been viewed via the Internet are typically stored for some

2   period of time on the device used to access the Internet.  This information can sometimes

3   be recovered with forensic tools.

4        53.   *Forensic evidence*.  As further described in Attachments B1 and B2, this

5   application seeks permission to locate not only electronically stored information that

6   might serve as direct evidence of the crimes described on the warrant, but also forensic

7   evidence that establishes how the SUBJECT DEVICES were used, the purpose of its use,

8   who used it, and when.  There is probable cause to believe that this forensic electronic

9   evidence might be on the SUBJECT DEVICES because:

10        a.   Data on the storage medium can provide evidence of a file that was

11   once on the storage medium but has since been deleted or edited, or of a deleted portion
     of a file (such as a paragraph that has been deleted from a word processing file).

12

13        b.   As explained herein, information stored within a computer and other
     electronic storage media may provide crucial evidence of the "who, what, why, when,

14   where, and how" of the criminal conduct under investigation, thus enabling the United
     States to establish and prove each element or alternatively, to exclude the innocent from

15   further suspicion.  In my training and experience, information stored within a computer

16   or storage media (e.g., registry information, communications, images and movies,
     transactional information, records of session times and durations, internet history, and

17   anti-virus, spyware, and malware detection programs) can indicate who has used or

18   controlled the computer or storage media.  This "user attribution" evidence is analogous
     to the search for "indicia of occupancy" while executing a search warrant at a residence.

19   The existence or absence of anti-virus, spyware, and malware detection programs may

20   indicate whether the computer was remotely accessed, thus inculpating or exculpating the
     computer owner and/or others with direct physical access to the computer.  Further,

21   computer and storage media activity can indicate how and when the computer or storage

22   media was accessed or used.  For example, as described herein, computers typically
     contain information that log: computer user account session times and durations,

23   computer activity associated with user accounts, electronic storage media that connected

24   with the computer, and the IP addresses through which the computer accessed networks
     and the internet. Such information allows investigators to understand the chronological

25   context of computer or electronic storage media access, use, and events relating to the

26   crime under investigation.   Additionally, some information stored within a computer or
     electronic storage media may provide crucial evidence relating to the physical location of

27   other evidence and the suspect.  For example, images stored on a computer may both

28   show a particular location and have geolocation information incorporated into its file

AFFIDAVIT OF SA HARDIN-PINEDA – 15
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  54. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## SEARCH AND/OR SEIZURE OF DIGITAL DEVICES

  55. Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit imaging or

AFFIDAVIT OF SA HARDIN-PINEDA – 16
USAO #2018R01379

1   otherwise copying all data contained on SUBJECT DEVICES, and will specifically

2   authorize a review of the media or information consistent with the warrant.

3         56.     In accordance with the information in this affidavit, law enforcement

4   personnel will execute the search of any computer or storage medium seized pursuant to

5   this warrant as follows:

6         a.     **Securing the Data**

7               i.     In order to examine the ESI in a forensically sound manner,

8   law enforcement personnel with appropriate expertise will attempt to produce a complete
    forensic image, if possible and appropriate, of the SUBJECT DEVICES.[1]

9               ii.    Law enforcement will only create an image of data physically

10  present on or within the SUBJECT DEVICES.  Creating an image of the SUBJECT

11  DEVICES will not result in access to any data physically located elsewhere.  However,
    SUBJECT DEVICES that have previously connected to devices at other locations may

12  contain data from those other locations.

13        b.     **Searching the Forensic Images**

14              i.     Searching the forensic images for the items described in

15  Attachments B1 and B2 may require a range of data analysis techniques.  In some cases,

16  it is possible for agents and analysts to conduct carefully targeted searches that can locate
    evidence without requiring a time-consuming manual search through unrelated materials

17  that may be commingled with criminal evidence.  In other cases, however, such

18  techniques may not yield the evidence described in the warrant, and law enforcement
    may need to conduct more extensive searches to locate evidence that falls within the

19  scope of the warrant.  The search techniques that will be used will be only those

20  methodologies, techniques and protocols as may reasonably be expected to find, identify,
    segregate and/or duplicate the items authorized to be seized pursuant to Attachments B1

21  and B2 to this affidavit.

22

23  [1] The purpose of using specially trained computer forensic examiners to conduct the imaging of
    digital devices or other electronic storage media is to ensure the integrity of the evidence and to

24  follow proper, forensically sound, scientific procedures.  When the investigative agent is a
    trained computer forensic examiner, it is not always necessary to separate these duties.

25  Computer forensic examiners often work closely with investigative personnel to assist

26  investigators in their search for digital evidence.  Computer forensic examiners are needed
    because they generally have technological expertise that investigative agents do not possess.

27  Computer forensic examiners, however, often lack the factual and investigative expertise that an
    investigative agent may possess on any given case.  Therefore, it is often important that

28  computer forensic examiners and investigative personnel work closely together.

AFFIDAVIT OF SA HARDIN-PINEDA – 17
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## **CONCLUSION**

2        57.        Based upon the evidence gathered in this investigation and set out above,

3   including but not limited to my review of data and records, information received from

4   other federal agents, and my training and experience, there is probable cause to believe

5   that evidence, fruits and/or instrumentalities of the crime of Title 21, United States Code,

6   Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to

7   distribute a controlled substance), as described in Attachments B1 and B2 to this affidavit

8   incorporated herein by reference, will be located during the search of SUBJECT

9   VEHICLE and SUBJECT DEVICES further described in Attachments A1 and A2 to this

10  affidavit, incorporated herein by reference.  I therefore request the Court to issue the

11  requested warrants.

12

13

14                          MICHELLE HARDIN-PINEDA
                            Special Agent, HSI
15

16        Subscribed and sworn to before me this  13ᵗᵉ day of February, 2019.

17

18

19                          RONALD B. LEIGHTON
                            United States District Judge
20

21

22

23

24

25

26

27

28

AFFIDAVIT OF SA HARDIN-PINEDA – 18
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **ATTACHMENT A1**
### **Item to be Searched**

A white 2011 International Prostar tractor truck, with California license plate WP83996 and vehicle identification number (VIN) 3HSCTAPR9BN323785, registered to Mulliner Enterprises, Inc., 932 Hibiscus Street, Montebello, California 90640 ("SUBJECT VEHICLE"); currently held at a Washington State Patrol storage facility located at 8623 Armstrong Rd. SW, Olympia, Washington.



ATTACHMENT A1 – 1
USAO #2018R01379

**ATTACHMENT B1**
**Items to be Seized**

The following items, records, and information, that constitute evidence, instrumentalities, or fruits of violations of Title 21, United States Code, Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance):

1.    Controlled substances, including but not limited to: methamphetamine, cocaine, crack cocaine, heroin, fentanyl, hashish, marijuana, MDMA, Oxycodone, and OxyContin;

2.    Monetary instruments, including but not limited to, currency, money orders, bank checks, gift cards, or similar monetary instruments, in excess of $500;

3.    Bank account information including bank statements, deposit tickets, canceled checks, Certificates of Deposit, safe deposit box rental agreement and entrance log, credit card statements and financial statements for domestic and foreign bank accounts, copies of money orders and cashier's checks, and records reflecting domestic and/or international wire transfers;

4.    Narcotic-related paraphernalia;

5.    Documentary evidence relating to the purchase, sale, and/or distribution of controlled substances;

6.    Notes, letters, and other items which relate to shipments of controlled substances;

7.    Documents and other items tending to show the existence of other stored drugs as follows: rental agreements, receipts, keys, notes, and maps specifically concerning off-site storage rooms and lockers;

8.    Address books, daily logs, daily telephone diaries, calendars, and appointment books;

9.    Digital computing devices, *e.g.*, tower and laptop computers; digital storage devices, *e.g.*, external hard drives and USB thumb drives; and optical and magnetic storage media, *e.g.*, Blue Ray discs, DVDs, and CDs;

10.    Weapons to include rifles, shotguns, knives, and handguns, as well as ammunition, shell casings, bullets, magazines, cleaning equipment, holsters, gun boxes

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   and cases, trigger locks, gun safes, gun parts and tools, targets, receipts, and bills of sale;

2
        11.     Cellular telephones and other communication devices including Blackberry,
3   Android, Galaxy, iPhone, iPad, and similar devices, may be seized and searched for the
    following records and information:
4
                a.      Assigned number and identifying telephone serial number (ESN,
5   MIN, IMSI, or IMEI);

6               b.      Stored list of recent received, sent, or missed calls;
                c.      Stored contact information;
7               d.      Stored photographs and videos of narcotics; stored photographs and
8   videos which relate to customers and their identifying information; stored photographs
    and videos which relate to the sources, amounts, types, payments for, and prices of drugs
9   trafficked; and stored photographs or videos that show the user of the phone and/or
    suspected co-conspirators;
10
                e.      Stored text messages related to the aforementioned crimes of
11  investigation, including Apple iMessages, Blackberry Messenger messages or other
    similar messaging services or applications where the data is stored on the telephone; and
12
                f.      Evidence of user attribution showing who used or owned the digital
13  device at the time of the things described in this warrant were created, edited, or deleted,
    such as logs, phonebooks, saved usernames and passwords, documents, and browsing
14  history.

15
        As used above, the terms "records" and "information" include all of the foregoing
16  items of evidence in whatever form and by whatever means they may have been created
17  or stored, including any form of computer or electronic storage (such as flash memory or
    other media that can store data) and any photographic form, including emails,
18  photographs, text messages, information contained in applications or "apps," and
19  calendar entries.

20

21

22

23

24

25

26

27

28

ATTACHMENT B1 – 2
USAO #2018R01379

1

2

### ATTACHMENT A2
### Items to be Searched

    a.    A black Alcatel Cricket phone ("SUBJECT DEVICE #1"), seized from

BRIHAN BENITEZ-GONZALEZ at the time of his arrest on November 11, 2018;

currently in the custody of Auburn Police Department at 340 E. Main Street Auburn,

Washington;

 

    b.    A gold, black, and white Samsung phone in a black Xbox case

("SUBJECT DEVICE #2") seized from BRIHAN BENITEZ-GONZALEZ at the time of

his arrest on November 11, 2018; currently in the custody of Auburn Police Department

at 340 E. Main Street Auburn, Washington; and

 

ATTACHMENT A2 – 1
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1         c.    A black Apple iPhone in a black and blue case ( "SUBJECT DEVICE

2  #3"), seized at the time of the arrest of OSCAR MILLAN on November 11, 2018;

3  currently in the custody of Auburn Police Department at 340 E. Main Street Auburn,

4  Washington.

5

6

7

8   

9

10

11

12

13

14  This warrant authorizes the forensic examination of the SUBJECT DEVICES for the
purpose of identifying the electronically stored information described in Attachment B2.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A2 – 2
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT B2
## Items to be Seized

The following records and information that constitute evidence, instrumentalities, or fruits of violations of Title 21, United States Code, Sections 841(a)(1) (distribution of a controlled substance) and 846 (conspiracy to distribute a controlled substance):

      a.    Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

      b.    Stored list of recent received, sent, or missed calls;

      c.    Stored contact information;

      d.    Stored photographs and videos of narcotics; stored photographs and videos which relate to customers and their identifying information; stored photographs and videos which relate to the sources, amounts, types, payments for, and prices of drugs trafficked; and stored photographs or videos that show the user of the phone and/or suspected co-conspirators;

      e.    Stored text messages related to the aforementioned crimes of investigation, including Apple iMessages, Blackberry Messenger messages or other similar messaging services or applications where the data is stored on the telephone; and

      f.    Evidence of user attribution showing who used or owned the digital device at the time of the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form, including emails, photographs, text messages, information contained in applications or "apps," and calendar entries.

ATTACHMENT B2 – 1
USAO #2018R01379

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970